# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FITCH MARINE TRANSPORT, LLC, ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **NO: 09-4450** |
| **AMERICAN COMMERCIAL LINES, LLC, ET AL.** | **SECTION: "S" (2)** |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs, Fitch Marine Transport, LLC, Mohawk Freedom Marine, LLC, and Kacomege L Transportation, LLC, are related companies[1] that brought this suit alleging that defendants wrongfully terminated various charter agreements.  Plaintiffs contend that they are entitled to $930,384.69 in lost profits that resulted from the wrongful terminations, plus prejudgment interest.

Defendant American Commercial Lines, LLC ("ACL") owns the vessels involved in the charter agreements.[2]  ACL argues that it properly terminated the charger agreements with Kacomege, and that all plaintiffs waived their right to contest any deficiencies in the formalities of the termination of their charger agreements.  ACL claims that plaintiffs owe it $67,135.43 for

---

[1] Larry Fitch was the 100% owner and operator of Fitch Marine and Mohawk Freedom.  Also, Larry Fitch owned 50% of Kacomege and was its sole operator.

[2] The vessels, the M/V JAMES E. PHILPOTT, M/V CHERYL DOBARD, M/V EDDIE TOUCHETTE, M/V TANYA McKINNEY, are named as *in rem* defendants.

damages that its vessels and equipment sustained while in plaintiffs' care, custody, and control. Further, ACL argues that the plaintiffs and third-party defendants, Larry Fitch, Fitch Transportation, Inc., and Mohawk Traveler Transportation, Inc., are liable for those damages *in solido* because they operate as a single business enterprise.

## BACKGROUND

Plaintiffs and ACL entered into four sets of charter agreements. The charter agreements are as follows:

1.   ACL bareboat chartered[3] the M/V JAMES E. PHILPOTT to Mohawk Freedom. Fitch Transportation, Inc. ("Fitch Transportation"), another related company, crewed the vessel. Then, Mohawk Freedom chartered the vessel back to ACL on a fully found basis.[4]

2.   ACL bareboat chartered the M/V CHERYL DOBARD to Fitch Marine. Fitch Transportation crewed the vessel. Then Fitch Marine chartered the vessel back to ACL on a fully found basis.

3.   ACL bareboat chartered the M/V EDDIE TOUCHETTE to Fitch Marine. Fitch Transportation crewed the vessel. Then Fitch Marine chartered the vessel back to ACL on a fully found basis.

4.   ACL bareboat chartered the M/V TANYA McKINNEY to Kacomege. Fitch Transportation crewed the vessel. Then

---

[3] A "bareboat" or "demise" charter agreement is characterized by a "complete transfer of possession, command, and navigation of the vessel from owner to the charter." Gaspard v. Diamond M. Drilling Co., 593 F.2d 605, 606 (5th Cir. 1979). The vessel is chartered without equipment or a crew. See Winn v. C.I.R, 595 F.2d 1060, 1062 (5th Cir. 1979).

[4] In a "fully found" charter, the owner or bareboat charterer delivers the vessel fully crewed, supplied and equipped, and ready to perform a particular job for the fully found charterer. See Winn, 595 F.2d at 1062.

Kacomege chartered the vessel back to ACL on a fully found basis.

The fully found charter agreements provided that ACL, as the charterer, could immediately terminate the charter agreement if Fitch Marine, Mohawk Freedom, or Kacomege failed to comply with certain minimum performance standards. The minimum performance standards termination clause in the fully found charter agreements states that ACL, as the charterer:

> may immediately terminate this Charter in the event that Owner (Fitch Marine, Mohawk, or Kacomege)[5] fails to comply with the Requirements of the Minimum Performance Standards 8, 9, 10, and 11 as outlined in Exhibit "B" herein[6] by furnishing written notice of such failure and termination to Owner (Fitch Marine, Mohawk Freedom, or Kacomege).

---

[5] Fitch Marine, Mohawk, and Kacomege are each described as the "owner" in the applicable fully found charter agreement because these entities effectively became the "owners" of the vessels pursuant to their bareboat charters of the vessels.

[6] The referenced "Requirements of Minimum Performance Standards" are:

8. Spills, which is defined as any release to the environment or deck of recordable quantity as defined by Charter. The minimum standard is that zero spills occur.

9. Marine Casualty, which is defined in 46 C.F.R. § 4.05-1. The minimum standard is that zero marine casualties occur.

10. Vessel Security Plan, which is defined in 33 C.F.R. § 104 for vessels towing any CDC or Subchapter D&O tank barges. The minimum standard is 100% compliance.

11. Incident Reporting, which requires notification of all incidents pursuant to 46 C.F.R. § 4.05-1 involving barges while in care and custody of the vessel, or contamination. The minimum standard is 100% compliance.

3

On October 12, 2008, the M/V TANYA McKINNEY was involved in an incident in Cote Blanche Canal which resulted in damage to her propellers on both the starboard and port sides of the vessel.[7] The captain of the M/V TANYA McKINNEY reported to Fitch Transportation's port captain, Glenn Smiley, that the vessel was experiencing a vibration.  Smiley dispatched divers to investigate.  The divers found a cable and line wrapped around the vessel's starboard propeller and reported that it might be bent.

On October 13, 2008, Smiley contacted Richard Fournier at ACL to inform ACL that the M/V TANYA McKINNEY was going to be placed in dry dock to investigate the cause of the vibrations.  Thereafter, ACL characterized the incident as a grounding, and determined that Kacomege did not properly report the incident.  As a result, ACL conducted a performance review of each of the four vessels chartered by plaintiffs.

On October 17, 2008, after the performance review, ACL notified Larry Fitch of the immediate termination of all of the bareboat and fully found charter agreements.  The termination letter stated in pertinent part:

> Please accept this letter as confirmation of our conversation of the immediate termination of the Fully Found and associated Bareboat Charters of the M/V Tanya McKinney, O.N. 626240; M/V Eddie Touchette, O.N. 549972; M/V James E. Philpott, O.N. 568630; M/V Cheryl Dobard, O.N. 555976 ("Charters") . . . This termination is for failure to comply with applicable operational laws and regulations, specifically the failure to report a grounding, as a marine casualty incident on or about October 13, 2008.  This termination is effective immediately and Charter Hire will Cease today, October 17, 2008.

---

[7]   At the time of the incident, Mike Bollinger, a pilot, was at the wheel.  He left the vessel after the incident, and the Fitch companies have not been able to contact him.

4

Larry Fitch signed and returned the letter to ACL below the words "Agreed and Accepted," and immediately returned the vessels.  On July 20, 2009, Fitch Marine, Mohawk Freedom, and Kacomege filed this suit alleging that ACL improperly terminated the fully found charter agreements.

Fitch Marine and Mohawk Freedom filed a motion for summary judgment regarding whether ACL properly terminated their fully found charter agreements for the M/V JAMES E. PHILPOTT, M/V CHERYL DOBARD, and M/V EDDIE TOUCHETTE.  The court granted the motion finding that ACL's termination letter did not provide written notice of termination to Fitch Marine or Mohawk Freedom as required by the minimum performance standards clause of the charter agreements because it did not inform Fitch Marine or Mohawk Freedom that their charter agreements with ACL were being terminated because they breached the minimum performance standards.  The court found that by stating that the terminations were "specifically" due to the October 13, 2008, incident involving the M/V TANYA McKINNEY, ACL indicated that there was no other reason for the terminations.  Therefore, the court found that the termination of ACL's charter agreements with Fitch Marine and Mohawk Freedom regarding the M/V JAMES E. PHILPOTT, M/V CHERYL DOBARD, and M/V EDDIE TOUCHETTE was not procedurally proper under the minimum performance standards termination clause.

**DISCUSSION**

**A.   Maritime Contract Interpretation**

This case involves the interpretation of charter agreements entered into between the parties. It is well established that a charter agreement is a maritime contract. See <u>Morewood v. Enequist</u>, 64

5

U.S. 491 (1860); see also Stolt-Nielsen SA v. Celanese AG, 430 F.3d 567, 572 (2nd Cir. 2005).

Generally, courts apply federal common law to resolve maritime disputes. Albany Ins. Co. v. Anh

Thi Kieu, 927 F.2d 882, 886 (5th Cir. 1991).   "However, to the extent that it is not inconsistent with

admiralty principles, state contract law may be applicable to maritime contracts." In re Tasch, Inc.,

46 Fed. Appx. 731 (5th Cir. 2002) (citing Ham Marine, Inc. v. Dresser Indus., Inc., 72 F.3d 454, 459

(5th Cir. 1995).  When interpreting a maritime contract, the general rules of contract construction

and interpretation apply. Marine Overseas Services, Inc. v. Crossocean Shipping Co., Inc., 791 F.2d

1227, 1234 (5th Cir. 1986); Ogea v. Loffland Bros. Co., 622 F.2d 186 (5th Cir. 1980).   Each

provision of a contract must be read in light of others so as to give each the meaning reflected by

the contract as a whole.  Southwestern Eng'g Co. v. Cajun Elec. Power Co-op., Inc., 915 F.2d 972

(5th Cir. 1990).  Further, each provision of a contract must be given a meaning that renders it, along

with all other provisions, effective rather than meaningless. See Lewis v. Hamilton, 652 So.2d 1327

(La. 1995). "Interpretation of the terms of a contract is a matter of law." Weathersby v. Conoco Oil

Co., 752 F.2d 953, 956 (5th Cir. 1984).

**B.     The Termination of ACL's Charter Agreements with Kacomege Regarding the M/V TANYA McKINNEY**

ACL characterized the October 12, 2008, incident involving the M/V TANYA McKINNEY

as a grounding, and concluded that Kacomege did not properly report the incident.  Smiley testified

that Brian Christy at ACL called him and stated that it was unacceptable to have a grounding and

not report it, but that he told Christy that there was no grounding.

At trial, plaintiffs put forth the theory that the M/V TANYA McKINNEY's propellers were damaged by a tree. Larry Fitch testified that in the Cote Blanche canal empty barges are fleeted by tying them to trees on the bank with cables and lines, and that sometimes trees are pulled into the water. He testified that he thought that the M/V TANYA McKINNEY sucked a mooring line and cable into the starboard wheel, which pulled the tree into the starboard wheel, where it was held in place by the cable and line and struck by the wheel, damaging the starboard propeller until it broke free. Larry Fitch did not offer any explanation for how the port propeller was damaged.

Larry Fitch's theory is unsupported. The photographs of the M/V TANYA McKINNEY's propellers show that all four flukes on the starboard propeller were bent and distorted. Also, the invoice from Johnny's Propeller Shop indicates that the port propeller was also damaged. Fournier, ACL's maintenance representative who has worked for ACL for 21 years, testified that he has never seen this type of propeller damage in any type of vessel incident other than a grounding. He testified that in his experience when a vessel strikes an object floating in the water, the propeller damage is typically limited to one or two bent flukes. Also, Fornier testified that the photographs show that paint was scraped and dragged off straight across the lower portion of the rudder, which is an indication of a grounding. Further, Fornier testified that there is debris on the floor of Cote Blache area, and that this debris and rocks in the soft mud typically cause propeller damage in a grounding.

Additionally, Fournier testified that he has worked on the M/V TANYA McKINNEY while she was in dry dock on at least 10 occasions, and that the propeller protrudes below the vessel's hull, contrary to the testimony and in court sketch provided by Larry Fitch, depicting the propeller being protected by the hull. Fournier testified that because the propeller is the low point, it can be

damaged in a grounding.  Photographs of the vessel in dry dock support Fornier's testimony regarding the positioning of the propeller.  Fournier testified that based on his experience and observation that the vessel ran aground.

Based on Fournier's testimony and the photographic evidence, the court concludes that the M/V TANYA McKINNEY ran aground on October 12, 2008.

Pursuant to the minimum performance standards standard termination clause in the fully found charter agreements ACL could immediately terminate the charter agreement if Kacomege failed to comply with the requirements of minimum performance standards 8, 9, 10, or 11 by giving Kacomege written notice of such failure and termination.  Minimum performance standard 9 provides that Kacomege could not have any marine casualties, as defined by 46 C.F.R. § 4.05-1.  Under this regulation, an unintended grounding is a marine casualty.  Therefore, the October 12, 2008, grounding of the M/V TANYA McKINNEY triggered ACL's right immediately to terminate the charter agreement pursuant to the minimum performance standards termination clause.

The termination letter states that ACL's charter agreements with Kacomege are being canceled for failure to abide by the "applicable operational laws and regulations," specifically the October 12, 2008, grounding of the M/V TANYA McKINNEY.  There is no requirement that ACL specifically use the phrase "minimum performance standards" in its termination letter, and "applicable laws and regulations" can be construed to mean "minimum performance standards" because the minimum performance standards refer to applicable laws and regulations.  Therefore, the court finds that ACL's termination of its charter agreements with Kacomege was proper under the minimum performance standards clause.

**C.   Fitch Marine's and Mohawk Freedom's Waiver of Claims for Damages for ACL's Procedurally Improper Termination of the Charter Agreements Regarding the M/V JAMES E. PHILPOTT, M/V CHERYL DOBARD, and M/V EDDIE TOUCHETTE**

ACL argues that Fitch Marine and Mohawk Freedom should be estopped from bring claims for damages for the procedurally improper termination of the ACL's charter agreements regarding the M/V JAMES E. PHILPOTT, M/V CHERYL DOBARD, and M/V EDDIE TOUCHETTE.

An admiralty court is not a traditional court of equity, but it "is well established that an admiralty court may use equitable principles where appropriate to avoid injustice." Montauk Oil Transp. Corp. v. Sonat Marine, Inc., 871 F.2d 1169, 1172 (2nd Cir. 1989).  Waiver is one equitable principal that the admiralty court may use to avoid injustice. Interpool Ltd, v. Bernuth Agencies, Inc., 129 F.3d 113 (2nd Cir. 1997) (citing Montauk Oil, 871 F.2d at 1172).

The court finds that applying the equitable principal of waiver is appropriate in this case. Specifically, the court finds that Fitch Marine and Mohawk Freedom waived their rights to bring lost profits claims because their principal, Larry Fitch, testified that he understood that ACL was terminating all of the charter agreements when he signed the October 17, 2008, termination letter "Agreed and Accepted." He did not inform ACL that the termination letter was defective. Fitch Marine and Mohawk Freedom had a contractual right by virtue of the charter agreements to retain possession of the vessels until the charter agreements were validly terminated.  They returned the vessels without asserting any such right.  Further, Larry Fitch's consulting with counsel in entering into the charter agreements, and in filing this lawsuit indicates he could have asserted a claim of improper termination before returning the vessels.  Moreover, ACL had grounds to terminate the charter agreements pertaining to the M/V JAMES E. PHILPOTT, M/V CHERYL DOBARD, and

M/V EDDIE TOUCHETTE under the minimum performance standards termination clause of which Larry Fitch was aware.  On June 25, 2008, and August 25, 2008, the M/V JAMES E. PHILPOTT was involved in groundings, and on July 22, 2008, the M/V EDDIE TOUCHETT was involved in the grounding of a barge in which the barge almost sank.  These incident are marine casualties as defined by 46 C.F.R. § 4.05-1[8], and violated minimum performance standard 9.  Also, on August

---

[8] 46 C.F.R. § 4.05-1 defines marine casualties as:

(1) An unintended grounding, or an unintended strike of (allison with) a bridge;

(2) An intended grounding, or an intended strike of a bridge, that creates a hazard to navigation, the environment, or the safety of a vessel, or that meets any criterion of paragraphs (a) (3) through (8);

(3) A loss of main propulsion, primary steering, or any associated component or control system that reduces the maneuverability of the vessel;

(4) An occurrence materially and adversely affecting the vessel's seaworthiness or fitness for service or route, including but not limited to fire, flooding, or failure of or damage to fixed fire-extinguishing systems, lifesaving equipment, auxiliary power-generating equipment, or bilge-pumping systems;

(5) A loss of life;

(6) An injury that requires professional medical treatment (treatment beyond first aid) and, if the person is engaged or employed on board a vessel in commercial service, that renders the individual unfit to perform his or her routine duties; or

(7) An occurrence causing property-damage in excess of $25,000, this damage including the cost of labor and material to restore the property to its condition before the occurrence, but not including the cost of salvage, cleaning, gas-freeing, drydocking, or demurrage.

(8) An occurrence involving significant harm to the environment as defined in § 4.03-65.

(b) Notice given as required by 33 CFR 160.215 satisfies the requirement of this section if the marine casualty involves a hazardous condition as defined by 33 CFR 160.203.

(c) Except as otherwise required under this subpart, if the marine casualty exclusively

12, 2008, there was a fuel spill off of the M/V CHERYL DOBARD, which is a violation of minimum performance standard 8. Because Fitch Marine and Mohawk Freedom violated a minimum performance standard, ACL had the right immediately to terminate its charter agreements with them. Therefore, the court finds that Fitch Marine and Mohawk Freedom, through their principal, Larry Fitch, waived their right to bring claims for lost profits for the termination of the charter agreements by voluntarily returning the vessels upon presentation of the termination letter, and waiting nine months to assert a claim for damages.

**D.      ACL's Counterclaims**

   **1.      Damage to the M/V TANYA McKINNEY**

The court found that the M/V TANYA McKINNEY was involved in a grounding on October 12, 2008.  ACL incurred expenses in the amount of $12,964.43, to repair the damage.  ACL did not include these costs in its in the counter claim against Kacomege, but the claim is included in the pre-trial order.

Rule 15(b)(2) of the Federal Rules of Civil Procedure provides that "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." FED. R. CIV. P. 15(b)(2).  Express consent may be given in the pretrial order. 6A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1493 93d ed. 2010.  A final pretrial order "controls the course of the

---

involves an occurrence or occurrences described by paragraph (a)(8) of this section, a report made pursuant to 33 CFR 153.203, 40 CFR 117.21, or 40 CFR 302.6 satisfies the immediate notification requirement of this section.

action" once it is entered and approved by the court.  FED. R. CIV. P. 16(d).  "It is a well-settled rule

that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and

evidence to be presented at trial. McGehee v. Certainteed Corp., 101 F.3d 1078, 1080 (5th Cir.

1996); see also Wilson v. Muckala, 303 F.3d 1207 (10th Cir. 2002) ("[T]he inclusion of a claim in

the pretrial order is deemed to amend any previous pleadings which do not include that claim.").

ACL included its counterclaim for damages to the M/V TANYA McKINNEY caused by the

October 12, 2008, grounding in the proposed joint pretrial order that was signed by attorneys for

plaintiffs and defendants.  Also, ACL presented evidence of the charges it incurred after the

grounding, i.e. the Verret Shipyard, Inc. invoice dated November 21, 2008, without objection from

plaintiffs.  Therefore, plaintiffs expressly consented to the trial of this issue and it will be treated as

if it were pleaded in ACL's counterclaim.

The Verret Shipyard, Inc. invoice dated November 21, 2008, shows that the following work

was done on the M/V TANYA McKINNEY: (1) drydock; (2) shorepower, hookup, plus 3 days; (3)

R/R both wheels, tailshafts and steering rudders; (4) recondition both shafts; (4) check alignment;

(6) repack both shafts; (7) purchase & install stack blower; and (8) replace stbd. floodlight, top of

wheelhouse.[9]

---

[9]  The charges on the invoice are:

| | |
|---|---|
| Drydock | $ 1,100.00 |
| Shorepower Hookup, Plus 3 Days | $   250.00 |
| | |
| Skilled - 91 hrs. @ $55.00 per hr. | $ 5,005.00 |
| Helpers 38 hrs. @ $45.00 per hr. | $ 1,710.00 |
| Electricians - 16 hrs. @ $55.00 per hr. | $   880.00 |
| Machinists - 33.5 hrs. @ $60.00 per hr. | $ 2,020.00 |
| Crane 6 hrs. @ $150.00 per hr. | $   900.00 |

ACL did not present any evidence that the work done on the stack blower and the starboard floodlight resulted from the October 12, 2008, grounding that bent the propellers. The invoice does not show, and ACL did not present any evidence regarding, which charges pertained to work to repair damage caused by the grounding. Without such evidence, it is impossible for the court to determine how much time and which materials pertained to such work. Therefore, ACL cannot recover for this claim.

### 2.      Damage to the Barges - **Third Party Property**

ACL asserted counter-claims against Fitch Marine, Mohawk Freedom, and Kacomege for damages to ACL's barges, and associated costs, that allegedly occurred while the barges were in plaintiffs' care, custody, and control.

Generally, indemnity provisions in maritime contracts are enforceable, even for a party's own negligence, if the indemnity provision is clear, express, and unambiguous. See Corbitt v. Diamond M. Drilling Co., 654 F.2d 329, 333 (5th Cir. 1981); Foreman v. Exxon Corp., 770 F.2d 490, 498 (5th Cir. 1985). Indemnity provisions should be construed to cover all losses "'which reasonably appear to have been within [the parties'] contemplation.'" Kemp v. Gulf Oil Corp., 745

---

|  |  |
|---|---|
| 30#'s SS wire | $    330.00 |
| 15#'s Flux | $      67.50 |
| 1 - 18" Exhaust Fan | $    293.46 |
| Supplies/Fittings from Verret Stock | $    251.72 |
| 5' X 25: X ½" plate | $      80.50 |
| 10' of ½" X 4" flat bar | $      57.50 |
| 2' of 3"J X5" angle | $      28.75 |
| Total | $12,694.43 |

F.2d 921, 924 (5th Cir. 1984) (quoting <u>Corbitt</u>, 654 F.2d at 333).  However, an indemnity provision "should not be read to impose liability for those losses or liability which are neither expressly within its terms nor of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage." <u>Corbitt</u>, 654 F.2d at 333.

The alleged damages to ACL's barges are:

(1)     On May 28, 2008, the M/V CHERYL DOBARD, which was chartered by Fitch Marine, lost control of its tow while topping around, and the barge ACBL 2130 broke loose and collided with a barge moored in a nearby fleet.  ACL incurred costs for a damage survey of the ACBL 2130 of $755.

(2)     On July 22, 2008, the M/V EDDIE TOUCHETTE, which was chartered by Fitch Marine, ran aground with the barge WTT 872 in tow.  ACL incurred of $27,535, for cargo transfer and barge repairs.

(3)     On August 1, 2008, the M/V TANYA McKINNEY, which was chartered by Kacomege, collided with a ship anchorage resulting in damage to several ACL barges, and requiring the transfer of cargo.  ACL incurred costs of $11,152.86, for cargo transfer and barge repairs.

(4)     On August 20, 2008, the barge ACL 96016 was damaged while in the tow of the M/V JAMES PHILPOTT, which was chartered by Mohawk Freedom.  ACL incurred costs of $5,263.50, for barge repair.

ACL contends that plaintiffs are obligated for the damages to the barges pursuant to Sections 3 and 8(b) of the master fully found charter agreements and Sections 11(b) and 12(f) of the bareboat charter agreements.

Section 3 of the master fully found charter agreements concerns redelivery and provides:

The ***Vessel(s)*** shall be redelivered by Charterer (ACL) to Owner (Fitch Marine, Mohawk Freedom, or Kacomege) upon termination of this Charter Party at a mutually acceptable port on the Inland Waterway System.  If the parties are unable to agree on a redelivery port, then the Charterer (ACL) shall designate the port of redelivery.

14

> Any damages beyond ordinary wear and tear, as determined by an off-charter survey after redelivery, shall be for the account of the Owner.

(emphasis added).

Section 8(b) of the master fully found charter agreements concerns use and operation of the vessels states:

> Owner (Fitch Marine, Mohawk Freedom, or Kacomege) warrants that it shall at all time and to its sole cost and expense maintain the **Vessel(s)**, its machinery and equipment in good, efficient condition, working order and repair, in accordance with good commercial maintenance practices so that the **Vessel(s)** shall be, insofar as due diligence can make it so, tight, staunch, strong, and well and sufficiently tackled, appareled, furnished and equipped, in every respect seaworthy and in good operating condition.

(emphasis added).

Section 12(f) of the bareboat charter agreements provides:

> Charterer (Fitch Marine, Mohawk Freedom, or Kacomege) shall bear the entire risk of loss, theft, destruction, partial or complete, of or to the **Vessel(s)** from any cause whatsoever and, except as otherwise provided herein, no such damage, loss, theft, or destruction shall release Charterer (Fitch Marine, Mohawk Freedom, or Kacomege) of its obligation under this Charter.  Charterer (Fitch Marine, Mohawk Freedom, or Kacomege) shall promptly notify Owner (ACL) of any damage, loss, theft, or destruction of or to the **Vessel(s)**.

(emphasis added).

Each of the above referenced charter agreement provisions applies to "Vessel(s)."  Section 1(a) of the master fully found and the bareboat charter agreements states the charter agreements apply to the "Vessel(s)" described in "Exhibit 'A'" to each charter agreement.  The "Vessel(s)" listed in the exhibits are the vessels that are the subjects of the charter agreements, i.e the M/V

15

JAMES E. PHILPOTT, M/V CHERYL DOBARD, M/V EDDIE TOUCHETTE, and M/V TANYA McKINNEY. The provisions do not mention barges.  Therefore, under Sections 3 and 8(b) of the master fully found charter agreements and Section 12(f) of the bareboat charter agreements, plaintiffs did not assume liability for the barge damage.

Further, under Section 11(b) of the bareboat charter agreements plaintiffs did not assume liability for barge damage.  Section 11(b) states that ACL has the right to recover from plaintiffs as damages all costs, expenses, losses and damages, including incidental and consequential damages incurred by ACL if the charter agreements were terminated for an event of default.  The charter agreements were not terminated pursuant to the events of default provided by Section 11.  Therefore, Section 11(b) is inapplicable.

Section12(h) of the bareboat charter agreements provides:

> **Charterer** (Fitch Marine, Mohawk Freedom, or Kacomege) does hereby **assume liability for**, and does hereby agree to indemnify, protect, defend and hold harmless Owner (ACL) from and against, **any and all** liabilities, obligations, losses, **damages**, penalties, claims, actions, suits, costs, filing fees or other official fees, expenses and disbursements, including attorneys' fees and expenses, of whatsoever kind and nature, imposed on, **incurred by** or asserted against **Owner** (ACL) agents (whether or not also indemnified against by any other party under any other document) **in any way relating to or arising out of operations relating to this Charter or any of the transactions contemplated hereby** or the enforcement of any of the terms of this Charter, or the lease, possession, use, relocation, condition, return or other disposition hereunder of the Vessel(s).  Owner (ACL) agrees to give Charterer (Fitch Marine, Mohawk Freedom, or Kacomege) prompt notice of the existence of any claim or liability giving rise to the obligation of the Charterer (Fitch Marine, Mohawk Freedom, or Kacomege)  to indemnify Owner (ACL) hereunder; provided however, that the failure to give such notice promptly, or at all, shall in no way dismiss, diminish or

> relieve Charterer (Fitch Marine, Mohawk Freedom, or Kacomege) of
> its obligation to indemnify Owner (ACL) hereunder.

(emphasis added).

In Section 12(h), plaintiffs agreed to assume liability for any and all damages incurred by ACL in any way relating to or arising out of operations relating to the charter agreement or any of the transactions contemplated by the charter agreement. The charter agreements were entered into for the purpose of plaintiffs' operating ACL's vessels to move ACL's barges. Because indemnity provisions should be construed to cover all losses "'which reasonably appear to have been within [the parties'] contemplation,'" Kemp, 745 F.2d at 924, and the parties clearly contemplated that the vessels would move ACL's barges during the charter agreements, Section 12(h) covers damage to ACL's barges that arose out of the charter agreements. In other words, it covers damage to the barges that occurred while the barges were in plaintiffs' care, custody, and control.

### a. ACL's Claim Regarding the ACBL 2130

On May 28, 2008, the M/V CHERYL DOBARD, which was chartered by Fitch Marine, lost control of its tow while topping around, and the barge ACBL 2130 broke loose and collided with a barge moored in a nearby fleet. The ACL incurred costs for a damage survey of the ACBL 2130 in the amount of $755. The cost of a survey does not constitute damage to the barge. Therefore, the court finds that ACL cannot recover for the damage survey.

17

### b.      ACL's Claim Regarding the WTT 872

On July 22, 2008, the M/V EDDIE TOUCHETTE, which was chartered by Fitch Marine, ran aground with the barge WTT 872 in tow.  ACL incurred costs in the amount of $27,535, for cargo transfer and barge repairs.

ACL did not prove that the barge was damaged by the intentional grounding. The barge was shingled before it came into the M/V EDDIE TOUCHETTE's care, custody, and control.  Although Fournier testified that shingling barges is a customary temporary repair, and that it takes a grounding or a collision to jar the shingles loose, ACL did not produce a barge inspection report that shows the condition of the barge before and after the incident.  The court cannot determine which damages were caused by the accident and which were a prior condition of the barge.  Therefore, ACL may not recover on this claim.

### c.      ACL's Claim Regarding the August 1, 2008, Incident Involving the M/V TANYA McKINNEY

On August 1, 2008, the M/V TANYA McKINNEY, which was chartered by Kacomege collided with a ship anchorage resulting in damage to several ACL barges, and requiring the transfer of cargo from one of the parties.  ACL incurred costs of $11,152.86, for cargo transfer and barge repairs.

Although plaintiffs admit that the collision was caused in part by pilot error,  ACL did not produce a barge inspection report that shows the condition of the barge before it came into the M/V M/V TANYA McKINNEY's care, custody, and control.  The court cannot determine which

18

damages were caused by the accident and which were a prior condition of the barge.  Therefore, ACL may not recover on this claim.

### d.      ACL's Claim Regarding the ACL 96016

On August 20, 2008, the barge ACL 96016 was damaged while in the tow of the M/V JAMES PHILPOTT, which was chartered by Mohawk Freedom.  ACL incurred costs of $5,263.50, for barge repair.

ACL did not produce a barge inspection report that shows the condition of the barge before it came into the M/V JAMES PHILPOTT's care, custody, and control.  The court cannot determine which damages were caused by the accident and which were a prior condition of the barge. Therefore, ACL may not recover on this claim.

### 3.      The M/V CHERYL DOBARD Fuel Spill

ACL asserted a counter claim against Fitch Marine for costs associated with a fuel spill from the M/V CHERYL DOBARD. On August 12, 2008, the M/V CHERYL DOBARD, which was chartered by Fitch Marine, released approximately 15 gallons of fuel into the Houston Canal.  ACL incurred costs of $9,464.64 for containment, cleanup, and disposal of the fuel.  Section 9(e) of the bareboat charter agreements provides:

> In the event of a spill or environmental damage resulting from spill or other Vessel(s) discharge, Charterer (Fitch Marine, Mohawk Freedom, or Kacomege) accepts full responsibility as operator of the Vessel(s).

Section 9 of the bareboat charter agreements is titled "Maintenance and Repairs." Subsections 9(a), (b), and (d) allocate specific costs regarding maintenance and repair on the

plaintiffs, and Subsection 9(c) gives ACL the right to inspect plaintiffs' maintenance records. Because Section 9 is devoted to the allocation of costs, it is reasonable to construe "responsibility" as meaning that plaintiffs are responsible for the costs associated with spills from the vessels. However, ACL admitted that it was at fault for the fuel spill because the cam lock valve handle was placed in the wrong position.  Under general Louisiana contract law, a party to a contract can be indemnified against its own negligence only if the intent is clearly expressed. See Rodrigue v. LeGros, 563 So.2d 248, 254 (La. 1990) (citing Soverign Ins. Co. v. Texas Pipe Line Co., 488 So.2d 282 (La. 1986)). The charter agreements state that plaintiffs "accept responsibility" for fuel spills as "operator[s]" of the vessels.  The charter agreements do not expressly state that plaintiffs accept responsibility for fuel spills that are caused by ACL.  Therefore, the charter agreements cannot be interpreted to mean that plaintiffs accepted "responsibility" for a fuel spill for which ACL admitted it was at fault, and ACL may not recover on this claim.

## CONCLUSION

On the basis of the above Findings of Fact and Conclusions of Law, the court finds that the M/V TANYA McKINNEY ran aground on October 12, 2008, and that ACL properly terminated the charter agreements for that vessel with Kacomege pursuant to the minimum performance standards termination clause.  Also, the court finds that Fitch Marine and Mohawk Freedom waived their right to assert a claim for damages against ACL for the procedurally improper termination of its charter agreements with them regarding the M/V JAMES E. PHILPOTT, M/V CHERYL DOBARD, and M/V EDDIE TOUCHETTE.  Further, the court finds that plaintiffs are not liable for ACL's

counterclaims regarding repairs to the M/V TANYA McKINNEY, damage to ACL's barges, and the August 12, 2008, fuel spill from the M/V CHERYL DOBARD.

New Orleans, Louisiana, this __3rd__ day of December, 2010.

**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**

21